Brevard, J.
This is a motion to set aside the verdict obtained by the plaintiff, in the Court of Common Pleas for Lexington district, and for leave to enter up judgment of nonsuit, or to have the benefit of a new trial.
The action was to try the titles to a certain tract of land ; and was brought in compliance with a joint resolution of the two houses .of the legislature of this State, of December, 1808.
It has been objected, on the part of the defendant, that the action is not maintainable; and a great part of the arguments on both sides, has been expended upon the question, whether the civil action in the form of “ trespass to try the titles to land,” in the name of “ the State,” as plaintiff, is properly maintainable ?
If the motion had been to arrest the judgment, or had arisen upon demurrer to a plea in abatement, I should have had no doubt of the propriety of the arguments on this point; but in support of of the motion submitted, 6they appear to me irrelevant and inapplicable.
If no action of this sort is properly maintainable in the name of the State, I am unable to perceive any reason why a nonsuit should be ordered, or a new trial granted.
It would be to no purpose, certainly, to grant a new trial: and to order a nonsuit would not settle the question, as it would not conclude the plaintiff from renewing the action in the same form.
*102 A nonsuit is, where the plaintiff is adjudged not to follow, or pursue his remedy, as he ought to do ; or is ordered, in consequence of a total or essential failure of necessary evidence, to go to a jury in proof of his claim or demand.
However, as the question has been made, and argued with great earnestness, and at great length, and a decision of it may, therefore, be reasonably expected, I shall not decline giving my opinion upon it.
The violation of a right is a wrong; and to redress the wrong, the law gives an action, which is the lawful demand of a right.
In order to determine in the present case, whether for the violation of the- right claimed, the proper legal remedy was applied, it is necessary to inquire, first, whether upon common law principles, a like remedy, in a like case, may be applied ; and if not, whether there is any statute law of this State, or of force therein, to authorize such a remedy.
The form of action used in this case, was prescribed by an act of the legislature of this State of February, 1791. Being substituted instead of the action of ejectment, which is abolished, it must be governed by the same principles of.law, which applied to that action. It combines, however, the action of trespass for the mesne profits, which lay at common law, after a recovery in ejectment; and I apprehend, it combines also the remedy by writ of assize, and writ of right; being, if I mistake not, the only real action properly maintainable by our law. But being more especially, a substitute for the action of ejectment, it is properly calculated to try the pos-sessory right to real estates.
The State of South Carolina having succeeded to all the rights and prerogatives of the King of Great Britain, within the territorial limits of the former Province of South Carolina, necessitates the inquiry, whether an action to try the possessory right to real estate, and recover the seisin thereof, was properly maintainable by, or would lie in the name of the King in this country, prior to our Revolution ? And it seems clear that the King could not maintain such an action.
The King cannot bring an action of assize, or ejectment, as by reason of his ubiquity he cannot be disseised, or dispossessed of any real property, which is once vested in him. Nor can he bring an action of trespass for breaking his close, or any other injury done to his soil or possession. There is no necessity for his making use of such actions, as he has much easier and more effectual remedies, by such prerogative modes of process as are peculiarly con *103 fined to the crown ; among which,; may be mentioned, information of intrusion, inquest of office, and mandamus. 3 Bl. Com. 257, 258, 261.
The King has a double capacity : a body natural, and a body politic. His body politic never dies ; the death of his natural body is called a demise. The word “ King” extends to his successors. He is the head of the body politic, and his subjects the mystical members. Plo. 177, 238, 261.
In relation to those rights which the King may legally vindicate jure corona,, he stands in the same light, and on the same ground nearly, as the “ State” in this country.
The English common law doctrine is, that all the lands within the realm, by whatever titles held, and by whomsoever possessed! are, in contemplation of law, in possession of the King, and held by him, either mediately or immediately. Plo. 498. Therefore, an intruder cannot gain any estate, on possession, against the King, nor can there be a tenant at sufferance of the King’s land. -Ibid, 546, 559. 1 Co. 16. Hardr. 461. The King cannot be turned out of possession-hut by matter of record. Runn. 17, 18. 6 Com. Dig. 64.
The analogy between “ the State,” and “ the King,” holds in all these particulars, and the same reasons apply to each. The State is an artificial person, or body politic, composed of all the citizens, or members of the community.
“ What constitutes a State ?
“ Not high raised battlements, nor labor’d mound—
“ Nor cities proud—
“ No : Men, high minded men—
“ Men who their duties know,
“ But know their rights, and knowing, dare maintain;
“ Prevent the long-aimed blow,
“ And crush the tyrant while they ¿.’end the chain—
“ These constitute a State.”
The eminent domain is in possession of the State ; and the property, in all lands not appropriated to private or individual uses, exclusively, or to particular public purposes, belongs to all the citizens composing the State equally ; and, although one citizen may have the actual exclusive possession of a part thereof, and may claim the same as private property, yet is it, constructively, and to all necessary public purposes, in possession of the State.
And I see no mischief or inconvenience which can result from this doctrine; as the State may, at any time, exert its claim, and *104 exercise its rights, in the same way as if no such adversary claim,; and possession was opposed : and if any opposition should be made, ^y any such claimant against the State, as would hinder or disturb the State in the exercise of its’r'ights,- the proper prerogative remedy/ by criminal process, might be resorted to*
Vacant, and other public lands, belong to all the members of the political society, called “ the State,” in joint tenancy ; and the pos-' session of one joint tenant is the possession of all. And no action lies for one joint tenant against his companion, for a trespass and ejectment, as to the lands held in joint tenancy.
Besides, it would seem inconsistent to prosecute the tenánl in possession for a trespass, as defendant, when he is one of the con* stituent members of the artificial body which sues as plaintiff.
For these reasons, I am of opinion, that, consistently with com* mon law principles, this action cannot be supported.
It remains to inquire, whether the action is authorized, or re* quire'd, by any statute law of this State, Or of force therein ?
An act of assembly of December, 1807, “ concerning the town of Saxegotha,” recites, that “ whereos, the old town of Saxegotha,-on the south side of the Congaree river, heretofore laid out and appropriated to such Germans and foreigners as would migrate to settle in this country, remains still subject to be granted for that purpose. And whereas, several of the •proprietors of lots in the' said town, and many others, have prayed that the said town should be granted to other uses,” and enacts, that certain commissioners therein named, shall be empowered to cause the lots in the said town, heretofore granted, to be laid off according to the original plan, and the part not granted, into convenient fields, to be leased. And it requires the commissioners to report to the legislature respecting “ such property as the State may be entitled to,” in the said •lands.
In December, 1808, the commissioners reported, pursuant to the" act, to the legislature then in session, that the town of Saxegotha contained 832 acres of land, part of which had been laid off as a town, and about ninety lots of the part laid off had been granted ; and that the rest remained subject to legislative disposal. Also,that part of the town lands was in the possession of certain persons who claimed the same by proprietary titles.
This report was immediately referred to a committee of the House of Representatives, who reported thereon, “ that, in their opinion, the State had good title” to the lands therein mentioned ; which, from the evidence laid before them, and, other evidence which might *105 he 'procured, fh&y were'of opinion might he established by a suit at law: and that as the land was of considerable value, they recommended to the House to authorize the commissioners “ to institute a suit, or suits, in the name of the State, against the trespassers on the same lands which was resolved accordingly ; and the Senate concurred in the report and resolution.
These legislative proceedings comprise all the evidence of statutory authority which has been, or can be produced in support of Ihe action : and if it were not that they have emanated from the collected wisdom of the State, I should never suspect there would be impropriety in charging them with incongruity and inconsistency. But as it is, I shall only say, that to my weak understanding, they seem somewhat obscure, and uncertain. And if I did not feel the necessity of attempting an explication of them, I. would decline the task; contented to reverence in silence what I cannot comprehend.
The act of 1807, so far as I understand it, authorizes the1 commissioners to lay off a town, so as to accommodate the proprietors of the lands which had been granted, pursuant to the original plan of a town for Saxegotha township, and to lay off the vacant, or ungranted lands adjoining, in small tracts, to be leased for certain purposes, until otherwise disposed of by the legislature.
The commissioners, in their report, say, that certain of the lands which, in their opinion, was public property, were in possession of persons who claimed the same as lands which had been granted, and were not subject to legislative disposal. Upon this, the committee of the House of Representatives report, that in their opinion, the claims of these persons are unfounded. And this opinion, they say, is founded, as well from evidence which they had not seen, but suppose might be procured, as upon evidence they had examined: and being of opinion that the right of the State might be established by a suit at law, they recommended that a suit, or suits, should be instituted in ihe name of the State, against the trespassers upon the disputed lands. A joint resolution of the two Houses passed accordingly.
The committee, in reporting, seems to .have been impressed with the mistaken notion, that in order to enable the State to ascertain and vindicate its rights in relation to these lands, and to that end to examine and decide on the titles of the occupants claiming, it Was necessary to prosecute a civil action, and try the titles in the Court of Common Pleas, as between party and, party, where granted lands are in dispute, and the State has no interest. That this no *106 tion is not unfounded, has been shewn. Upon this unfounded notion, however, the resolution appears to stand. The intent of the resolution was not, I apprehend, to change the law ; but if this was its object, I have no hesitation in saying that it is not competent to effect it. '
If the resolution be construed according to legal and rational principles, it must be expounded to authorize the commissioners to commence and prosecute a constitutional and legal remedy, by a mode of procedure known and sanctioned by law, and not such a remedy as that which the commissioners have attempted to apply ; a remedy altogether unnecessary and useless, as well as novel, on such an occasion.
It is not necessary, at present, to inquire what would be the proper mode of redress on such an occasion ; yet, I have no scruple in saying, that if any judicial process is necessary, it must issue from the Court of General Sessions, and not from the Court of Common Pleas; because “ the breach of public rights, or duties, which affect the whole community, considered as a community, is distinguished by the harsh appellation of crimes and misdemeanors. The redress of private injuries is to be sought by civil suit or action ; but public wrongs furnish or require a more speedy remedy.” 3 Bl. Com. 2. 4 Bl. Com. 5. An information of intrusion wo.uld probably be the most appropriate mean of redress. It lies for any trespass committed on the lands of the crown, as by entering thereon without title, holding over, &c. 4 Bl. Gom. 261. This process does not suppose the King out of possession, but on the contrary, that the party intruded on the King’s possession. And the judgment is not in the nature of a seisin or possession, but only quod pars committatur et capialurpro fine. And upon that, an injunction issues for the possession against the party himself, and all claiming under him. Hardr. 460, Friend v. The Duke of Richmond.
By a little stretch of the rules of construction, the resolution may be forced to intend this mode of proceeding, or some other criminal process ; otherwise, in my opinion, it can have no effect.
I now proceed to consider, what appears to me to be the only material question necessary and proper to be determined in this case; namely, whether there was any evidence given to support the action, as brought, which could be considered sufficient, giving it all the weight and effect it could have upon the most favorable construction, to warrant the finding of the jury ; and whether a nonsuit ought not to have been granted for the want of evidence 1
*107 The evidence produced was, in substance, as follows :
1. A manuscript volume, containing the minutes of the Council of State, or Upper House of the Legislature, under the royal government; from whence it appeared, — I. That Governor Johnson was authorized to grant certain lands in this (then) Province. 2. That certain instructions were sent to him by the board of trade and plantations, to Jay off eleven townships, to consist of 20,000 acres of land each, with six miles square circumjacent, to be reserved fór the use; of poor foreign Protestants, who should come and settle .thereon. 3. That the Governor recommended to the legislature to pass an act to carry those instructions into effect. 4. That one Francis Young was authorized, accordingly, to lay off a township on the Congaree, or Santee river. That Henry Young was after-wards ordered to mark out a town and township, instead of Francis Young, about the Congaree, and extending .on the south side of Santee. 5. That the Governor communicated to the legislature a plan of a township, run out by Henry Young, on the south side of Santee river, which site said Young had reported to below, and subject to inundation, and, therefore, recommended another on the opposite side of the river. G. That the other branch of the legislature had agreed to this recommendation ; and that, the same was concurred in by the upper House ; and that an appropriation of money was made to defray the expense of carrying this measure into execution. 7. That the legislature recommended the appointment of persons to fix the site of the town, generally, without laying the same off into lots, until the arrival of settlers, when the same should be laid off, occasionally, in lots, and granted to settlers, as they should arrive, free from charge- 8. That a further appropriation was made, to defray the expense of laying off the town, and to pay for the passage of poor foreign Protestants, to settle the same, and to furnish them with the implements of husbandry. 9. And that when grants were to issue to other than those for whom mese lands were reserved, a proviso should be inserted therein, that if the land thereby granted, should be within the reserved tract, the grant should be void.
2. Parol evidence, locating the site of Saxegotha town and’township, as supposed to be laid out by the persons appointed for that purpose ; and proving that about twenty settlers, answering the description of those for whom the lands were, reserved, established themselves upon the same.
.3. Three or four patents, or original grants, for certain small parcels of land within the township, containing also a grant of one *108 ^ot ^e town, as annexed to each parcel in the township: hut none of these grants affected, immediately, the land iu question.
It appeared, upon examination of the plaintiff’s evidence, that in ^ie J'ear 1746, no emigrants had arrived to settle the lands first offered by the King, except a few Swiss; and it did not appear that these Swiss actually settled in Saxegotha township. And it also appeared that one of the books containing minutes of the acts and proceedings of the government, after this time, was lost, or mislaid ; which afforded room for a presumption that other instructions had been transmitted from, England, authorizing other proceedings than those which appeared from the written evidence produced. From original grants, produced in evidence, and from the grant books in the office of the Secretary of State, it appeared that the proviso which has been mentioned, was uniformly inserted in all grants issued prior to the 5th of December, 1761, and that subsequent to that time it was uniformly omitted : which confirms the presumption, that the government had relinquished the plan or scheme of settling the township with poor Protestants from' Europe, exclusively ; and had granted the same to whoever applied, without distinction, and in such quantities as the applicants might desire, upon their compliance with the terms and conditions customary in granting the vacant lands of the Province.
The grant to Job Marion, under which the defendant claimed, dated January 14, 1770, strengthens the presumption. I lay no stress, however, on this document, as it was not produced by the plaintiff.
This is, I believe, a fair, although brief, statement of the evidence; and in it I am unable to discover any semblance of legal title, upon those principles upon which the claim has been advanced.
It has not been pretended that the locus in quo is vacant, or unappropriated land, or that it has relapsed to the State by an escheat. The title endeavored to be established, appears to be of a mixed and mongrel character — a legal non-descript — neither a legal, nor an equitable title, but partaking of the character of both : and the arguments which have been urged to support it, although learned and ingenious, appear of the same cut and character, and marvel-lously adapted to such a claim.
The reservation of lands for the accommodation of “ poor foreign Protestants,” intended to be laid out into township lots, adjoining the town in every direction, was such an appropriation, it is pretended, as amounted to a grant of the soil; and that the King was thereby so far divested of the right of property in his political ca *109 .pacity, as to be incapable of granting the same afterwards, to any •other person, or persons. Again, it is said, this reservation did not amount to an absolute or complete grant; but it was a quasi grant; something in the nature of a trust, by which the King became a trustee, appointed by himself; and the State having, by force and arms, seized upon the trust, and made itself trustee in the place of the King, it is bound, in conscience, and in law, to a faithful execution of the trust. Again, it is said, that his majesty gave a royal fledge, and that the State is bound to redeem it. That there was a compact, a covenant, and I don't know what, between the King and the “ poor Protestants,” which obliged the King to keep those ■lands in reserve, sacred for their use, until they should choose to ■claim them : and that any grants afterwards issued by the King, for any land within the boundaries of this holy and forbidden ground, should be held and adjudged ipso facto null and void.
If the King’s title was divested, how can the State claim, and by what title ? It is said the legal title resides in the State, because the King was only equitably divested ; and that the equitable grantees have a legal right to enforce the due execution of the trust •royal, which has devolved upon the State.
The idea of a jus fiduciarum, produced or created in the manner supposed in argument, is singular enough. I am utterly at a loss to conceive what equitable considerations support the trust; and equaily at a loss to know how the cestui que trust could be identified,*or ascertained.
The ideá of a covenant or compact is still more singular. A title of this sort, supported in the way that it was, appears to me so strikingly extravagant and burlesque, that I scarcely know how to ■treat it seriously.
A compact, between whom? The King’s government of South Carolina, on the part of his majesty, and “ the poor foreign Protestants” of all nations arid languages, dispersed over the face of the earth, “ from Paris to Peru, from Naples to Japan all who might, in long succession, during the lapse of ages, impelled by poverty, or expelled by religious intolerance, by tribes, by families, or by solitary adventurers, pass over the Jordan, to inhabit this new Canaan, which the King had given them to possess it !
But these “ poor Protestants,” vagrants from every clime, were to form a barrier, for the protection of the frontier settlers, against the incursions of the aboriginal savages. This was the condition of the grant. If this was the consideration of the covenant, there was a failure of the consideration ; for the barrier never was *110 erected by the covenantees; or if any was attempted to be reared, it was too feeble to answer the intended purpose, without the aid other materials.
^Ut W^° are W^° ar6 ent‘c'e<^ WOTOi t0 *be benefit of this pretended grant; to complain of this breach of covenant ? Are they the descendants of those who settled in the township, and obtained grants for their several portions of the •promised land1 Of what do they complain ? Was it the King’s fault that the township lands were not populated, nor- thetqyvn built? Because these things did not lake place, were they to come in for the rest of those lands, as contingent remainder-men, or reversionary heirs ? Or were the lands to remain vacant until the poor foreign Protestants should find it convenient, or should be permitted to migrate and settle them ?
And if others are entitled to claim, who are they ? The descendants of all the poor foreign Protestants who were in esse at the time of the pretended grant; or all those who answer that description at this day ? And can they lawfully claim these lands before they become naturalized citizens ?
If the act of 1807, be adverted to, it will appear that the legislature, in passing that act, distinguished between granted and un-granted lands; and the subsequent resolution goes upon the same distinction.
The trespasses pointed at in the resolution, must mean trespassers on ungranted lands, and not on lands which had’passed*from the King, or the State, by grant. In the granting of lands by public authority, a patent, or a public law, is essential.
In the act and resolution, there is riot a word said of a compact, a covenant, a trust, or a pledge. The reservation, as was well observed by the defendant’s counsel, was a political arrangement, which might be abandoned or modified, as the government saw proper. It was nothing like a grant, or a contract.
I am of opinion that a nonsuit ought to be ordered.